**IN THE UNITED STATES DISTRICT COURT FOR**
**THE EASTERN DISTRICT OF PENNSYLVANIA**

DONALD URBANIC AND BETH ANN ROSICA :
                                    :
     *Plaintiffs*                      :      No.: 2:20-CV-05588
                                    :
     *v.*                              :      Civil Action - Law
                                    :
BOROUGH OF WEST CHESTER             :
and MAYOR DIANE HERRIN              :
                                    :
     *Defendants*                      :

_____

## [PROPOSED] ORDER

     **AND NOW**, upon consideration of the Motion for Preliminary Injunction and Other Relief

submitted by Plaintiff Donald Urbanic and Plaintiff Beth Ann Rosica and Defendants' Response

thereto, **IT IS HEREBY ORDERED** that such Motion is **DENIED**.

                     **BY THE COURT:**

                            _____

## IN THE UNITED STATES DISTRICT COURT FOR
## THE EASTERN DISTRICT OF PENNSYLVANIA

DONALD URBANIC AND BETH ANN ROSICA :
                                        :

        *Plaintiffs*             :         No.: 2:20-CV-05588

                                          :

          *v.*                   :         Civil Action - Law

                                          :

BOROUGH OF WEST CHESTER :
and MAYOR DIANE HERRIN :
                                        :

        *Defendants*           :

## DEFENDANT BOROUGH OF WEST CHESTER'S
## AND DEFENDANT MAYOR DIANE HERRIN'S
## MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS'
## MOTION FOR PRELIMINARY INJUNCTION AND OTHER RELIEF

Defendant Borough of West Chester (the "Borough") and Defendant Mayor Diane Herrin

(the "Mayor" and, sometimes together with the Borough, the "Defendants"), by and through their

undersigned counsel, Kristin S. Camp, Esquire, Michael S. Gill, Esquire, and Buckley, Brion,

McGuire & Morris LLP, hereby file this Memorandum of Law in Opposition to Plaintiffs' Motion

for Preliminary Injunction and Other Relief and state as follows:

### I.    **INTRODUCTION.**

Defendants respond here to the remaining parts of the Motion for Temporary Restraining

Order, Preliminary Injunction, and Other Relief which Plaintiff Donald Urbanic and Plaintiff Beth

Ann Rosica (collectively, the "Plaintiffs") filed with this Court [ECF No. 2], as supplanted by the

remaining parts of the filing which Plaintiffs submitted to this Court on November 25, 2020 [ECF

No. 11].[1]

---

[1] Plaintiffs styled the Motion as a "Motion for Temporary Restraining Order, Preliminary Injunction, and Other Relief" and filed that document [ECF No. 2] on November 19, 2020 (the "Original Motion"). On November 20, 2020, this Court denied that portion of the Original Motion pursuant to which Plaintiffs requested a Temporary Restraining Order [ECF No. 3]. On November 25, 2020, Plaintiffs submitted to this Court another filing entitled

Pursuant to the Motion, Plaintiffs ask this Court to enter an Order enjoining (A) enforcement of the Emergency Ordinance (as hereinafter defined), (B) issuance by the Mayor of "any emergency declarations that interfere with the privacy and property rights of Plaintiffs [,]" and (C) passage of "any ordinance similar to [the Emergency Ordinance] that unreasonably interferes with the privacy and property rights of Plaintiffs."

In this moment of maximum public health danger, such injunctive relief (especially relief as amorphous and open-ended as that which Plaintiffs seek) would compromise Defendants' ability to respond to the COVID-19 crisis which continues to ravage the Borough, the Commonwealth of Pennsylvania, and the entire country. For the reasons set forth in this Memorandum of Law, this Court should deny the Motion.

## II.     STATEMENT OF FACTS.

The Borough is a Home Rule Municipality organized and existing under and pursuant the Home Rule Charter and Optional Plans Law, 53 Pa.C.S. § 2901 *et seq*., and the Home Rule Charter of the Borough of West Chester (the "Home Rule Charter").  All legislative power within the Borough is vested in a seven-member council comprised of one representative from each of the seven voting wards within the jurisdictional limits of the Borough ("Borough Council").

The Mayor is the head of Borough government for ceremonial purposes and is the civilian leader of the Borough Police Department. She also maintains and, as appropriate, exercises the powers which the citizens of the Borough delegated to her pursuant to Section 401 of the Home Rule Charter. Those powers include the ability to "declare a state of emergency [] when a serious threat to life, health, or safety of the citizens of the Borough shall occur within the Borough . . ." BOROUGH OF WEST CHESTER, PA., HOME RULE CHARTER § 401.I (1994). The Mayor's power to

---

"Plaintiffs' Motion for Temporary Restraining Order, Preliminary Injunction, and Other Relief" [ECF No. 11] (the "Second Motion" and, sometimes together with the Original Motion, the "Motion").

declare a state of emergency within the Borough and take actions regarding that emergency are temporally limited to the period before "appropriate action can be taken by [Borough] Council." Id.

The COVID-19 pandemic constitutes an emergency situation with significant global and local impacts. On March 11, 2020, the World Health Organization (WHO) and the Centers for Disease Control and Prevention (CDC) declared COVID-19 a "public health emergency of international concern" and a "pandemic." See Rolling Updates on Coronavirus Disease (COVID 19), World Health Organization (updated July 31, 2020), https://www.who.int/emergencies/diseases/novel-coronavirus-2019/events-as-they-happen; Coronavirus Preparedness and Response: Hearing before the H. Oversight and Reform Comm. 116th Congress (March 11, 2020) (testimony of Robert R. Redfield, M.D., Director of the CDC), https://www.cdc.gov/washington/testimony/2020/t20200311.htm.  On March 13, 2020, President Donald Trump declared a national emergency as a result of COVID- 19.  See Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak, Proclamation No. 9994, 35 Fed. Reg. 15337 (March 18, 2020). On March 6, 2020, and in the context of the then burgeoning community spread of COVID-19, Governor Tom Wolf "proclaim[ed] the existence of a disaster emergency throughout the Commonwealth[]" (as amended through the date of this Brief, the "Governor's Emergency Declaration").[2] Proclamation of Disaster Emergency (March 6, 2020), https://www.governor.pa.gov/wp-

---

[2]    Defendants respectfully request that the Court take Judicial Notice of the facts cited herein, pursuant to Rule 201 of the Federal Rules of Evidence.

content/uploads/2020/03/20200306-COVID19-Digital-Proclamation.pdf.   As of the date of this

Memorandum of Law, the Governor's Emergency Declaration remains in effect.[3]

In an effort to stop the spread of COVID-19, Governor Wolf and Secretary of the

Pennsylvania Department of Health, Dr. Rachel Levine, issued orders and guidance for

Pennsylvania residents and businesses (collectively "Early Mitigation Orders").[4]  As part of these

Early Mitigation Orders, Pennsylvanians were not permitted to leave their homes unless absolutely

necessary.   Non-essential businesses were closed until a phased re-opening could take place,

depending on county-wide infection rates.

Despite an initial slowing of COVID-19 infections, following the implementation of the

Early Mitigation Orders, a second wave of COVID-19 cases began in the summer months. See

Lisa Lockerd Maragakis, M.D., M.P.H., Coronavirus Second Wave? Why Cases Increase,

Hopkins Medicine (November 17, 2020), https://www.hopkinsmedicine.org/health/conditions-

and-diseases/coronavirus/first-and-second-waves-of-coronavirus. That second wave developed

into an even larger surge in the fall. Id. As a result, Governor Wolf and Secretary Levin issued

---

[3]       The   Governor's   Emergency   Declaration   was   renewed   three   times:
https://www.governor.pa.gov/wp-content/uploads/2020/06/20200603-TWW-amendment-to-COVID-disaster-
emergency-proclamation.pdf (June 3, 2020); https://www.governor.pa.gov/wp-content/uploads/2020/09/20200831-
TWW-amendment-to-COVID-disaster-emergency-proclamation.pdf         (August         31,         2020);
https://www.governor.pa.gov/wp-content/uploads/2020/11/20201124-TWW-3rd-Amendment-COVID-19-
Proclamation.pdf (November 24, 2020).  Defendants respectfully request that the Court takes Judicial Notice of the
facts cited herein, pursuant to Rule 201 of the Federal Rules of Evidence.

[4]       These Early Mitigation Orders have been suspended or significantly amended since Pennsylvania
"reopened" in early summer.  See e.g. Order of the Governor Directing Targeted Mitigation Measures, dated July 15,
2020, as amended, https://www.governor.pa.gov/wp-content/uploads/2020/07/20200715-TWW-targeted-mitigation-
order.pdf ; Order of the Governor Regarding the Closure of All Businesses That Are Not Life Sustaining, dated March
19,   2020,   as   amended,   https://www.scribd.com/document/452416027/20200319-TWW-COVID-19-Business-
Closure-Order ; Order of the Secretary of the Pennsylvania Department of Health Directing Public Health Safety
Measures   for   Businesses   Permitted   to   Maintain   In-person   Operations,   dated   April   15,   2020
https://www.governor.pa.gov/wp-content/uploads/2020/04/20200415-SOH-worker-safety-order.pdf;  Order  of  the
Secretary of the Pennsylvania Department of Health Regarding the Closure of all Businesses That Are Not Life
Sustaining, dated March 19, 2020, as amended, https://www.scribd.com/document/452409377/03-19-20-Soh-Covid-
Order.

further orders and guidance (collectively "<u>Recent Mitigation Orders</u>")[5] in an attempt to "prevent the spread while continuing to allow for necessary resumption of economic and social activity…[and] to take steps to minimize the danger to Pennsylvanians as a result of participating in that activity." Proclamation of Disaster Emergency (November 24, 2020), https://www.governor.pa.gov/wp-content/uploads/2020/11/20201124-TWW-3rd-Amendment-COVID-19-Proclamation.pdf.

The Recent Mitigation Orders focus on the operation of commercial establishments such as bars, restaurants, and retail establishments.  For example, the Governor's Order for Mitigation, Enforcement, and Immunity Protection sets maximum occupancy for indoor and outdoor events and orders commercial establishments to require patrons to wear face coverings.  <u>See</u> Order of the Governor of the Commonwealth of Pennsylvania for Mitigation, Enforcement, and Immunity Protections (November 23, 2020), https://www.governor.pa.gov/wp-content/uploads/2020/11/20201123-TWW-mitigation-enforcement-immunity-order.pdf.

The Borough is not immune to the effects of the pandemic and the recent surge in cases. In addition to case counts, the Chester County Department of Health monitors the level of community transmission of COVID-19.  <u>See</u> Chester County Department of Health at https://www.chesco.org/DocumentCenter/View/60838/Monitoring-and-Protecting-Green.   This

---

[5]     Order of the Governor of the Commonwealth of Pennsylvania for Mitigation Relating to Businesses in the Retail Food Services Industry (November 25, 2020), https://www.governor.pa.gov/wp-content/uploads/2020/11/20201123-TWW-retail-food-services-mitigation-order.pdf; Order of the Governor of the Commonwealth of Pennsylvania for Mitigation, Enforcement, and Immunity Protections (November 23, 2020), https://www.governor.pa.gov/wp-content/uploads/2020/11/20201123-TWW-mitigation-enforcement-immunity-order.pdf; Limited-Time Stay at Home Advisory of the Governor of the Commonwealth of Pennsylvania (November 23, 2020), https://www.governor.pa.gov/wp-content/uploads/2020/11/20201123-TWW-stay-at-home-advisory.pdf; Order of the Secretary of the Pennsylvania Department of Health for Mitigation Relating to Travel (November 17, 2020), https://www.health.pa.gov/topics/Documents/Diseases%20and%20Conditions/SOH%20Travel%2011-25-2020.pdf ; Updated Order Requiring Universal Face Coverings (dated November 17, 2020), https://www.health.pa.gov/topics/Documents/Diseases%20and%20Conditions/Updated%20Order%20of%20the%20Secretary%20Requiring%20Universal%20Face%20Coverings.pdf.

level is determined by observing the infection rate per 100,000 people.  A level of greater than 80 infected individuals per 100,000 indicated a community transmission level of "very high," the highest possible level of community transmission.  See Chester County Department of Health at https://chesco.org/DocumentCenter/View/59143/School-Guidance-?bidId=.  Data from the Department of Health indicated that, in the Borough, for the week of September 22, 2020, the number of infections per 100,000 people was 165.93.[6]  For the week of September 29, 2020, the number of infections per 100,000 people was 130.73.  As such, the community transmission rate for the Borough was within the "very high" range as of late September 2020.

In light of the number of cases, the very high community transmission level, and for the purposes set forth therein, on October 2, 2020, the Mayor issued the emergency declaration in form and substance attached to the Complaint (as hereinafter defined) as **Exhibit A** thereto (the "Initial Mayoral Emergency Declaration"). Later, on October 12, 2020, the Mayor amended the Initial Mayoral Emergency Declaration in the manner as set forth in the document attached to the Complaint as **Exhibit B** thereto (as so amended, the "Mayoral Emergency Declaration").

On October 21, 2020, Borough Council held its first regularly scheduled non-work session meeting following the Mayor's issuance of the Mayoral Emergency Declaration (the "October 21 Borough Council Meeting"). Pursuant to Section 401.I. of the Home Rule Charter, the Mayoral Emergency Declaration expired as of the October 21 Borough Council Meeting.

Borough Council conducted a legislative public hearing during the October 21 Borough Council Meeting (the "Public Hearing") to consider, and possibly adopt, Ordinance No. 09-2020 (the "Emergency Ordinance").  During the Public Hearing, Borough Council received information

---

[6]  This data was presented at the legislative public hearing referenced *infra*, a recording of which is available at: https://west-chester.com/CivicMedia?CID=Public-Hearings-22#player.

and opinions regarding the COVID-19 crisis from medical professionals and lay individuals including Plaintiff Beth Ann Rosica. After considering that information and those opinions and, following discussion by Members of Borough Council regarding the merits of the Emergency Ordinance, Borough Council adopted the Emergency Ordinance. The final vote in that regard was 4-3.[7]

Borough Council considered testimony from Dr. Shafinaz Akhter, Director of Antimicrobial Stewardship and Infection Prevention at the Chester County Hospital, and Dr. Karen Pinsky, Chief Medical Officer at the Chester County Hospital. Those experts stated that the most effective methods to prevent community spread of COVID-19 include mask wearing, the maintenance of distance between individuals, and limiting the number of gathered individuals.[8] Dr. Akhter testified that the most common means of community spread of COVID-19 is through close contact with others.  This is because droplets expelled from an infected person through talking, singing, coughing, or sneezing can reach the mucus membranes of another person and cause infection in that person.

The Borough Director of Building and Housing testified regarding the density of housing in the Borough.[9]  Using 2010 census data, Mr. Gore testified that the Borough has a population of approximately 18,461 and an area of 1.85 square miles for a density of 10,000 people per square

---

[7]    Plaintiffs claim that "[t]he Ordinance ultimately passed with a 5-4 vote from Borough Council . . . ." That claim is incorrect. There are only seven members of Borough Council and the actual vote regarding the Emergency Ordinance was, as noted, 4-3.

[8]    https://west-chester.com/CivicMedia?CID=Public-Hearings-22#player (Dr. Akhter's testimony begins at 29:20 and Dr. Pinsky's testimony begins at 40:01).

[9]    https://west-chester.com/CivicMedia?CID=Public-Hearings-22#player (Mr. Gore's testimony begins at 44:37).

mile.  He testified further that there are approximately 5,800 rental units in the Borough with typically four people per dwelling unit.

Borough Police Chief James Morehead testified that the Police Department (while discharging other law enforcement activities) reported gatherings in excess of ten people at private residences where individuals assembled without facial coverings or observing social distancing.[10] Chief Morehead also testified that there was a significant decrease in complaints of large gatherings in the rental community since the Mayor issued the Mayoral Emergency Declaration.

In light of that testimony, the Emergency Ordinance proscribes "gatherings of more than 15 people in any one dwelling unit, both indoors and outdoors . . . ."  That proscription applies "[i]n all housing types . . . ." Id.

On November 9, 2020, Plaintiffs filed with this Court Plaintiffs' unverified Complaint [ECF No. 1]. Plaintiffs filed the Original Motion on November 19, 2020 [ECF No. 2]. On November 20, 2020, this Court dismissed that portion of the Original Motion pursuant to which Plaintiffs requested a Temporary Restraining Order [ECF No. 3].  Then, on November 25, 2020, Plaintiffs filed the Second Motion [ECF No. 11]. On that day, this Court rejected that portion of the Second Motion pursuant to which Plaintiffs, again, sought a Temporary Restraining Order [ECF No. 14]. Counsel for Plaintiffs and undersigned counsel for Defendants agree that the deadline for Defendants to submit this Brief and the accompanying Response to the Motion pursuant to Local Rule 7.1 is determined from the date on which Plaintiffs filed the Second Motion.

---

[10]     https://west-chester.com/CivicMedia?CID=Public-Hearings-22#player     (Chief     Morehead's testimony begins at 47:57).

III.    **ARGUMENT.**[11]

"A preliminary injunction 'is an extraordinary remedy [] which should be granted only in

limited circumstances.'" Greater Phila. Chamber of Commerce v. City of Phila., 949 F.3d 116,

133 (3d Cir. 2020) (quoting Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 800

(3d Cir. 1989). Plaintiffs

> must establish four factors to get a preliminary injunction: (1) the
> likelihood that [Plaintiffs] will prevail on the merits at the final
> hearing; (2) the extent to which [Plaintiffs are] being irreparably
> harmed by the [Emergency Ordinance]; (3) the extent to which
> [Defendants] will suffer irreparable harm if the preliminary
> injunction is issued; and (4) that the public interest weighs in favor
> of granting the injunction.

Id. (quoting A.T.&T. Co. v. Winback & Conserve Program, Inc., 42 F.3d 1421, 1427 (3d Cir.

1994)).

Plaintiffs "must establish the first two factors and only if these 'gateway factors' are

established does [this C]ourt consider the remaining two factors. Id. (citing Reilly v. City of

Harrisburg, 858 F.3d 173, 179 (3d Cir. 2017)).  Then, this Court should "determine [] 'in its sound

discretion if all four factors, taken together, balance in favor of granting the requested preliminary

relief.'" Id.

When considering a request for a preliminary injunction, this Court applies the rule that

"'the burdens at the preliminary injunction stage track the burdens at trial[.]'" Gonzales v. O

Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418, 429 (2006). In a First Amendment

freedom-of-speech case, after a plaintiff presents "a 'colorable claim' that the [challenged] law

---

[11]     Curiously, in the Motion and the Memorandum of Law which Plaintiffs submitted with that filing,
Plaintiffs do not include any citations to any opinions of the United States Court of Appeals for the Third Circuit or
of this Court.

restricts some form of speech [, the] government must . . . 'justify its restriction . . . under whatever level of scrutiny is appropriate given the restriction in question.'"

In light of the foregoing standard, this Court must deny the Motion.

### A.      Plaintiffs Are Not Likely To Succeed In This Litigation.

Recently, in another newsworthy context, the Third Circuit Court of Appeals observed that "[f]ree, fair elections are the lifeblood of our democracy [and that c]harges of unfairness are seriousness. *But calling an election unfair does not make it so.*" <u>Donald J. Trump for President, Inc., v. Secretary Commonwealth of Pennsylvania</u>, No. 20-3371, 2020 U.S. App. LEXIS 37346 at *4 (3d Cir. Nov. 27, 2020) (*emphasis added*).  Similarly, simply calling a public health ordinance which a municipality enacted in the face of a deadly pandemic "unconstitutional" does not make it so.

In the Motion, however, Plaintiffs attempt just such alchemy by asserting their claims in only the most conclusory manner. Plaintiffs claim without explanation or analysis that, pursuant to the Emergency Ordinance, the Borough violated "Plaintiffs rights enshrined under the United States Constitution. . . ." In that regard, Plaintiffs note only

> [t]he freedoms of assembly and association guaranteed under the First Amendment [,] rights to privacy and property guaranteed by the Fourth and Fifth Amendments [,] and . . . guarantees of due process and equal protection under the Fifth and Fourteenth Amendments.

Such bald assertions, without more, cannot serve as the basis for the extraordinary remedy of a preliminary injunction. That conclusion is even more evident when the cost of imposing that injunction would very likely be measured in numbers of infected individuals, occupied hospital beds, and deaths within the community.

1.      Plaintiffs will likely not succeed on their First Amendment claim.

Plaintiffs offer only that this Court may issue an injunction if they "show [] serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to . . . [D]efendants if an injunction is issued." Plaintiffs, though, do not show any such "serious questions," articulate the bases for their First Amendment claim, or attempt to establish that the Emergency Ordinance acts to deprive them of a fundamental right. Rather, Plaintiffs refer generally to what they call their "axiomatic" freedom of association and declare that "[t]he Emergency Declaration and Ordinance, [*sic*] violate the freedoms of association and assembly guaranteed Plaintiffs and all Borough residents by the First Amendment of the U.S. Constitution."

Of course, like other freedoms protected by the Bill of Rights, the freedoms of association and assembly which Plaintiffs call "axiomatic" are anything but. Indeed, the Supreme Court's and the Courts of Appeals' interpretation of the freedoms of association and assembly are far more nuanced. The Supreme Court

> refer[s] to constitutionally protected 'freedom of association' in two distinct senses. In one line of decisions, the Court has concluded that choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role such relationships in safeguarding the individual freedom that is central to our constitutional scheme. In this respect, freedom of association receives protection as a fundamental element of personal liberty. In another set of decisions, the Court has recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment – speech, assembly, petition for the redress of grievances, and the exercise of religion. The Constitution guarantees freedom of association of this kind as an indispensable means of preserving other individual liberties.

Roberts v. United States Jaycees, 468 U.S. 609, 617-618 (1984).

Plaintiffs fail to describe in the Complaint or the Motion which genre of freedom of association they claim Defendants are violating pursuant to the Emergency Ordinance. Neither do

Plaintiffs allege any facts which tend to establish a depravation of those rights. Notwithstanding that lack of specificity, Defendants will address here each type of freedom of association which the Supreme Court identified in *Roberts*.

    a.    <u>Plaintiffs do not make any "intimate human relationships" claim.</u>

To sustain an intimate human relationships-based freedom of association claim, Plaintiffs must first allege and then establish that the Emergency Ordinance operates to deprive Plaintiffs from "form[ing] and preserv[ing] . . . certain kinds of highly personal relationships" which deserve "sanctuary from unjustified interference by the State." <u>Id.</u> at 618 (<u>citing</u>, <u>e.g.</u>, <u>Pierce v. Society of Sisters</u>, 268 U.S. 510, 534-535 (1925)). The Supreme Court has not "precisely identified every consideration that may underlie [the] type of constitutional protection" which may apply to "certain kinds of highly personal relationships . . . ." <u>Id.</u> The Court did, however, recognize that "certain kinds of personal bonds have played a critical role in the culture and traditions of the Nation by cultivating and transmitting shared ideals and beliefs[.]" <u>Id.</u> at 618-619. Those types of relationships "foster diversity and act as critical buffers between the individual and the power of the State." <u>Id.</u> at 619 (<u>citing</u>, <u>e.g.</u>, <u>Zablocki v. Redhall</u>, 434 U.S. 374, 384-386 (1974)).

The Court went on to note that

> [t]he personal affiliations that . . . suggest some relevant limitations on the relationships that might be entitled to this sort of constitutional protection [] are those that attend to the creation and sustenance of a family – marriage; childbirth; the raising and education of children; and cohabitation with one's relatives.

<u>Id.</u>

Though the Supreme Court did not identify with specificity the point where interpersonal relationships lose First Amendment protections, it did observe that protected relationships are characterized by "relative smallness, a high degree of selectivity in decisions to begin and maintain

12

the affiliation, and seclusion from others in critical aspects of the relationship." Id. at 620. The

Court held that "[a]s a general matter, only relationships with these sorts of qualities are likely to

reflect the considerations that have led to an understanding of freedom of association as an intrinsic

element of personal liberty." Id. The Supreme Court has

> not held that constitutional protection is restricted to relationships
> amount family members [but does] protect [] those relationships,
> including family relationships, that presuppose 'deep attachments
> and commitments to the necessarily few other individuals with
> whom one shares not only a special community of thoughts,
> experiences, and beliefs but, also, distinctively personal aspects of
> one's life.

Board of Dirs. of Rotary Int'l. v. Rotary Club of Duarte, 481 U.S. 537, 545 (1987) (quoting
Roberts, 468 U.S. at 619-620).

In 1988, the Third Circuit considered whether the sister-in-law/brother-in-law relationship

is within the scope of intimate relationships which are protected by the First Amendment. See

Rode v. Dellarciprete, 845 F.2d 1195 (3d Cir. 1988).  There, a government employee alleged that

her employment superiors violated her associational rights when they "engaged in [a] course of

retaliatory harassment . . . to deter her from associating with" her brother-in-law. Id. at 1204. The

Court of Appeals rejected that claim, holding the sister-in-law/brother-in-law relationship "was

neither 'selected,' nor bound by blood." Id. at 1205 (internal citations omitted).  The Court further

noted that the sister-in-law's "assertion that she and [her brother-in-law] were 'good friends' [did

not] appear sufficient to invoke protection where their relationship was not based on the 'creation

and sustenance of a family.'" Id. (quoting Roberts, 468 U.S. at 619)).

Nowhere in either the Complaint or the Motion can Defendants or this Court find any

allegation that the Emergency Ordinance operates to prevent Plaintiffs from gathering with any

individuals with whom they maintain any intimate relationship. Defendants and this Court are left

to guess the identity of those people.

We do, however, know that those individuals are not part of Plaintiffs' household. By its express terms, the Emergency Ordinance is inapplicable to gatherings by members of individual households.[12]  Accordingly, the Emergency Ordinance does nothing to interfere with Plaintiffs' spousal or parental relationships. On the facts as pled by Plaintiffs themselves, therefore, the Plaintiffs do not allege that the Emergency Ordinance operates to deprive Plaintiffs of a fundamental right.

This Court, therefore, must deny the Motion.

b.      Plaintiffs do not make any "expressive association" claim.

Freedom of association also includes "a correlative freedom to engage in group effort toward" the "individual's freedom to speak, to worship, and to petition the government for a redress of grievances." Roberts, 468 U.S. at 622. The Supreme Court called this "[t]he right to associate for expressive purposes" and has "long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." Id. (citing, e.g., NAACP v. Claiborne Hardware Co., 458 U.S. 886, 907-909 (1982).

Neither the Complaint nor the Motion contain any allegation that the Emergency Ordinance operates to prevent Plaintiffs from associating with individuals in pursuit of activities which are protected by the First Amendment. Plaintiffs do not (and cannot) claim, for example, that the Emergency Ordinance prevents Plaintiffs from engaging in protected speech or petitioning the government for a redress of grievances. Likewise, as a further example, Plaintiffs do not (and cannot) claim that the Emergency Ordinance prevents Plaintiffs from engaging in any religious

---

[12]      For purposes of the Emergency Ordinance, a "household" is defined as "all persons living in the same dwelling unit." Plaintiffs do not allege that the Emergency Ordinance operates to preclude them from associating with any individual who is not a member of their household but with whom they maintain an intimate relationship which is within the scope of First Amendment protection.

activities. Nor, of course, could Plaintiffs make any such claims for, by its express terms, the Emergency Ordinance does not apply to political protests or religious services.

The Complaint and the Motion lack any factual basis upon which Plaintiffs could establish that the Emergency Ordinance prevents them from creating and maintaining intimate relationship.

Plaintiffs do not make any colorable claim that, pursuant to the Emergency Ordinance, Defendants violated Plaintiffs' right of assembly and association as the Supreme Court interprets that right. Absent any such claim and left only with Plaintiffs' self-serving and conclusory declaration that the violations caused by Defendants' conduct are "axiomatic," this Court cannot conclude that Plaintiffs have a likelihood of success on the merits.

This Court, therefore, must deny the Motion.

    <u>c.</u>    <u>Even if Plaintiffs made a colorable "intimate human relationships" claim, they would likely not prevail.</u>[13]

Freedom of association based on intimate human relationships "receives protection as a fundamental element of personal liberty." <u>Roberts</u>, 468 U.S. at 618. In that regard, the freedom "is protected by the due process clauses." <u>Montgomery v. Stefaniak</u>, 410 F.3d 933, 937 (7th Cir. 2005). Courts use a two-part inquiry to analyze freedom of association claims based on intimate human relationships. <u>See id.</u> (citing <u>Zablocki v. Redhail</u>, 434 U.S. 374, 383-87 (1978)). First, this Court should determine if the Emergency Ordinance "imposes a direct and substantial burden on an intimate relationship [and, if so] it is subject to strict scrutiny[.]" <u>Id.</u> "[I]f the [Emergency Ordinance] does not impose a direct and substantial burden, it is subject only to rational basis review." <u>Id.</u>

---

[13]    This Section of this Memorandum of Law applies with equal force to Plaintiffs' Fourth Amendment claim.

Just as Plaintiffs fail to allege the existence of any intimate relationship which they cannot form or maintain because of the Emergency Ordinance, they fail to allege how, if at all, the Emergency Ordinance imposes a "direct and substantial burden" on any such relationship.

Accordingly, to the extent this Court applies to the Emergency Ordinance any standard of review at all, it should apply rational basis review. Of course, that standard of review is "the most deferential of standards." Romer v. Evans, 517 U.S. 620 (1996).

Under rational basis review, "legislation enjoys a presumption of validity and [Plaintiffs] must negate every conceivable justification for the classification in order to prove that the classification is wholly irrational." Brian B. v. Pennsylvania Dep't. of Educ., 230 F.3d 582, 586 (3d Cir. 2000) (citing Federal Communications Comm'n. v. Beach Communications, 508 U.S. 307, 314-315 (1993)).

The nature of the legitimate and substantial government interest which the Borough seeks to advance pursuant to the Emergency Ordinance is known to this Court and set forth elsewhere in this Memorandum of Law. For the reasons set forth in the recitation of facts above and at Footnote 20 in this Memorandum of Law, the Borough had (at least) a rational reason to craft the Emergency Ordinance so that regulation applies only to dwelling units and not commercial establishments. As also set forth elsewhere in this Memorandum of Law, the Emergency Ordinance does nothing to prevent Plaintiffs from using electronic means to form and maintain relationships with more than fifteen individuals outside of their household. Finally, Plaintiffs offer nothing to negate the Borough's justification for the Emergency Ordinance.

This Court, therefore, must deny the Motion.

      d.      <u>Even if Plaintiffs made a colorable "expressive association" claim, they would likely not prevail.</u>

Assuming, *arguendo*, that Plaintiffs presented a colorable claim that the Emergency Ordinance operates to infringe upon Plaintiffs' right of expressive association, they are still not likely to prevail on the merits of that claim.[14]

The Tenth Circuit Court of Appeals has acknowledged that "the right of association is no more absolute than the right of free speech or any other right; consequently, there may be countervailing principles that prevail over the right of Association." <u>Grace United Methodist Church v. City of Cheyenne</u>, 451 F.3d 643, 658 (10th Cir. 2006) (<u>citing</u> <u>Walker v. City of Kansas City</u>, 911 F.2d 80, 89 n.11 (8th Cir. 1990)).

"Constitutional rights to free speech and assembly are not absolute." <u>Benner v. Wolf</u>, 461 F.Supp. 36 154, 165 (M.D. Pa. 2020). "Content-neutral 'time, place, and manner' regulations are permitted 'so long as they are designed to serve a substantial governmental interest and do not unreasonably limit alternative avenues of communication.'" <u>Id.</u> (citing, e.g., <u>Grace United</u>, 451 F.3d at 658). "The principal inquiry in determining content neutrality . . . is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." <u>Id.</u> (quoting <u>Ward v. Rock Against Racism</u>, 491 U.S. 781, 791 (1989)).

---

[14]     In 1905, the Supreme Court held that the Constitution did not preclude the Commonwealth of Massachusetts from imposing upon its citizens a mandate to be vaccinated against smallpox. <u>See</u> <u>Jacobson v. Massachusetts</u>, 197 U.S. 11 (1905). Earlier this year, in a case involving COVID-19 pandemic-related measures in California, Chief Justice Roberts referred approvingly to the Supreme Court's decision in *Jacobson*. <u>See</u> <u>South Bay United Pentecostal Church v. Newsom</u>, 2020 U.S. Lexis 30141. More recently, however, in another case involving COVID-19 pandemic-related measures, Associate Justice Gorsuch criticized The Chief Justice's reference to *Jacobson* as a basis for reviewing such measures. <u>Roman Catholic Diocese v. Cuomo</u>, 2020 U.S. Lexis 5708. To be sure, *Jacobson* remains "good law" and Associate Justice Gorsuch's criticism came in the context of a Free Exercise of Religion case (and not a Freedom of Association, Privacy, and Takings case). In light of the Associate Justice's comments, though, Defendants use traditional notions of First Amendment jurisprudence to analyze Plaintiffs' claims. In short, when this Court concludes that the Emergency Ordinance should survive traditional analysis, it will, *a priori*, conclude that measure survives analysis under *Jacobson*.

Plaintiffs do not (and cannot) make any claim that the Emergency Ordinance is content-based. The Emergency Declaration applies equally to all dwelling-types within the jurisdictional limits of the Borough regardless of the content of any messages which those who would gather might exchange.

Likewise, the Emergency Ordinance does nothing to limit Plaintiffs' ability to gather via telephone, Facetime, Zoom, WebEx, GoToMeeting, other video-conferencing, social media, or other electronic media. Packingham v. North Carolina, 137 S. Ct. 1730, 1735 (2017) (holding that "[w]hile in the past there may have been difficulty in identifying the most important places (in a spatial sense) for the exchange of views, today the answer is clear. It is cyberspace . . . and social media in particular."). Of course, and as noted above, the Emergency Ordinance is expressly inapplicable to political protests or religious services.

The Emergency Ordinance is a content-neutral 'time, place, and manner' regulation. As noted below, there is no question that the Emergency Ordinance serves substantial governmental interest of preventing more transmissions of COVID-19 and more cases of serious illness and death. Finally, the Emergency Ordinance does not prevent Plaintiffs from using electronic methods to gather and exchange ideas with other individuals.[15]

This Court, therefore, must deny the Motion.

2.     There is no likelihood that Plaintiffs will succeed on their Fourth Amendment claim.

In the Motion, Plaintiffs make only a passing reference to their Fourth Amendment claim. They do nothing in that filing, though, to further explain the bases for that claim. Nevertheless,

---

[15]     Plaintiffs seem to argue that the Emergency Ordinance is not narrowly tailored because it does not apply to non-residential properties or dwelling units outside of the jurisdictional limits of the Borough. For Defendants' response to that argument, see Section C. of this Memorandum of Law, infra.

Defendants address here the absence of any likelihood that the Fourth Amendment can serve as a basis for Plaintiffs' success.

Plaintiffs do not (and cannot) allege that, pursuant to the Emergency Ordinance, Defendants effected a physical invasion of Plaintiffs' home. Rather, Plaintiffs appear to suggest that the availability of "quasi-criminal citations and fines" invades a right to privacy which, Plaintiffs assert, they enjoy within "their private, residential property within the Borough."

A Fourth Amendment privacy claim without an actual physical invasion of an individual's home may rest upon one of two theories. The first is "an 'interest in avoiding disclosure of personal matters' [and] the [second is] an interest in 'making certain kinds of important decisions' free from government interference." Nat'l. Aeronautics & Space Admin. v. Nelson, 562 U.S. 134, 144 (2011) (quoting Whalen v. Roe, 429 U.S. 589, 598-600 (1977)); Dombrowski v. Governor Mifflin Sch. Dist., 2012 U.S. Dist. LEXIS 90674.

The Third Circuit has described the first of those theories as "the right to not have intimate facts concerning one's life disclosed without one's consent." Malleus v. George, 641 F.3d 560, 564 (3d Cir. 2011) (citing Bartnicki v. Vopper, 200 F.3d 109, 122 (3d Cir. 1999)). When considering whether information is within the scope of that right, the Court would consider "whether it is within an individual's reasonable expectation of confidentiality [,]" as "[t]he more intimate or personal the information, the more justified is the expectation that it will not be subject to public scrutiny." Id. (quoting Malleus, 641 F.3d at 564)).

The second theory of privacy which the Supreme Court noted in Nat'l. Aeronautics & Space Admin. "generally pertains to 'marriage, procreation, contraception, family relationships, and child rearing and education." Id. (quoting Whalen v. Roe, 429 U.S. 589, 600 (1977)).

Here, Plaintiffs continue their pattern of conclusory statements. In neither the Complaint nor the Motion do Plaintiffs inform Defendants or this Court of any personal information or matter which Plaintiffs are compelled to disclose pursuant to the Emergency Ordinance. Likewise, Plaintiffs fail to identify any important life decisions with which Defendants have interfered.

For at least the following reasons, those failures are not surprising.

Firstly, the Emergency Declaration does not require that Plaintiffs disclose to Defendants any information whatsoever. The Emergency Ordinance operates only to regulate the number of individuals who may gather at a given location and at a given point in time and includes no reporting requirements of any nature or form whatsoever. There is nothing within the Emergency Ordinance which could conceivably require Plaintiffs to produce anything to Defendants.

Secondly, and for reasons similar to those addressed at Section III.A.1.a. of this Memorandum of Law, there is nothing within the Emergency Ordinance which regulates the privacy interests which Plaintiffs have in making important and intimate life decisions. No part of the Emergency Ordinance purports to allow Defendants to inject the government into Plaintiffs' actions, private thoughts, experiences, or beliefs.

Plaintiffs fail to articulate in the Motion any bases for their Fourth Amendment claim. For the foregoing reasons, however, Plaintiffs are unlikely to prevail even if they did attempt to allege any such bases.

This Court, therefore, must deny the Motion.

3.      Plaintiffs cannot obtain injunctive relief on their Fifth Amendment and Fourteenth Amendment claim.

Plaintiffs next press their request for injunctive relief to prevent what they allege is a violation of their Fifth Amendment rights. In that regard, Plaintiffs allege that the Emergency Ordinance effectuated a taking of their property without just compensation. Regardless of whether

Plaintiffs have any likelihood of succeeding on the merits of that claim (and, to be clear, they have none) their request for injunctive relief in this regard must fail.

Injunctive relief is not available for takings claims when a state has a process for establishing and awarding just compensation remedies. See Knick v. Twp. of Scott, 139 S. Ct. 2162 (2019) (holding that, though a Fifth Amendment Takings Claim arises at the moment government takes property without compensation, "[g]overnments need not fear that. . . . holding will lead federal courts to invalidate their regulations as unconstitutional . . .[a]s long as just compensation remedies are available . . . injunctive relief will be foreclosed."); Cty. of Butler v. Wolf, 2020 U.S. Dist. LEXIS 93484 (United States District Court for the Middle District of Pennsylvania holding that declaratory relief from Governor Wolf's COVID-related business shutdown orders on an unconstitutional taking basis "would be the functional equivalent of injunctive relief [and that t]he Supreme Court's decision in *Knick* forecloses such relief.").

Of course, Pennsylvania law recognizes the concept of an "inverse taking" or "de facto condemnation." See, e.g., Machipongo Land & Coal Co. v. Dep't. of Envtl. Prot., 799 A.2d 751, 765 (Pa. 2002). Pennsylvania law also, of course, provides a robust statutory scheme pursuant to which Plaintiffs can pursue just compensation if they wish to assert in state court that the Emergency Ordinance effectuated an inverse taking of their property. 26 Pa.C.S.A. § 502.(c).

Defendants do not here concede that any compensable taking of Plaintiffs' property occurred and, in any event, that issue is not before this Court. For purposes of Defendants' response to the Motion, it is sufficient to note the unavailability of injunctive relief in the context of a Takings Claim.

This Court, therefore, must deny the Motion.

**B.      Plaintiffs Will Not Suffer Irreparable Injury If This Court Denies The Motion.**[16]

"[E]stablishing a risk of irreparable harm is not enough. A plaintiff has the burden of proving a 'clear showing of immediate irreparable injury.'" Hohe v. Casey, 868 F.2d 69, 72 (3d Cir. 1989) (quoting ECRI v. McGraw-Hill, Inc., 809 F.2d 223, 226 (3d Cir. 1987)). Assuming, *arguendo*, that this Court concludes that Plaintiffs demonstrated a likelihood of success on the merits of their First Amendment claim, they cannot establish the irreparable injury required for issuance of a preliminary injunction pursuant to the Motion.

"Constitutional harm is not necessarily synonymous with the irreparable harm necessary for issuance of a preliminary injunction." Id. at 73 (citing City of Los Angeles v. Lyons, 461 U.S. 95, 112-13 (1983)). "[T]he assertion of First Amendment rights does not automatically require a finding of irreparable injury . . . entitling a plaintiff to a preliminary injunction if he shows a likelihood of success on the merits." Id. at 72-73 (citing Rushia v. Town of Ashburnham, 701 F.2d 7, 10 (1st Cir. 1983)). Rather, Plaintiffs "must show 'a chilling effect on free expression.'" Id. at 72 (quoting Dombrowski v. Pfister, 380 U.S. 479, 487 (1965)).  As noted above, however, neither the Motion nor the Complaint include any allegation of any such "chilling effect."

This Court, therefore, must deny the Motion.

---

[16]      The availability of monetary damages precludes a finding of irreparable harm. See A.O. Smith Corp. v. FTC, 530 F.2d 515, 525 (3d Cir. 1976). (holding that "the rule [regarding irreparable harm is that] the injury must be of a peculiar nature, so that compensation of money cannot atone for it[.]"). For the reasons set forth above, Plaintiffs cannot establish any irreparable harm associated with their Fifth Amendment Takings claim. Furthermore, Plaintiffs have failed to articulate in the Motion any harm (irreparable or otherwise) which would flow from the violations of the Fourth Amendment which they allege. Accordingly, Defendants here address only Plaintiffs' First Amendment claim.

### C.     The Borough Will Be Irreparably Harmed If This Court Grants The Motion.[17] [18]

Plaintiffs avoid in the Motion any serious discussion of the irreparable harm which the Borough will suffer if this Court grants the Motion.[19] Rather, Plaintiffs focus their efforts in that regard on the fact that "[n]othing with respect to the . . . [Emergency] Ordinance controls the movement of Borough residents to neighboring jurisdictions, nor the size of gatherings attended when in such geographical locations."[20] Confusingly, Plaintiffs assert that Defendants' lack of jurisdiction in municipalities outside of the Borough makes "clear that granting the relief requested by Plaintiffs is far less a harm to Defendants than it would be for the Court to refuse to" grant the Motion.

Plaintiffs, however, ignore this Court's recent Orders in this case and in *Philadelphia Restaurant Owners Against Lockdown, LLC v. Kenney*. This Court held that it could not "conclude at this stage that Plaintiffs' harm outweighs the potential harm to the general public if the [City of

---

[17]     Because Plaintiffs failed to establish a likelihood of success on the merits or irreparable harm, this Court may not grant the Motion. See Greater Phila. Chamber of Commerce, 949 F.3d 133.  Nevertheless, for the sake of a complete and thorough reply to the Motion, Defendants address here, and below, the remaining two preliminary injunction factors.

[18]     Pursuant to Fed. R. Civ. P. 65, any Preliminary Injunction which this Court would issue must "describe in reasonable detail . . . the acts restrained or required." Fed. R. Civ. P. 65.(d)(1)(C). Here, Plaintiffs ask this Court to restrain Defendants from "issuing any emergency declarations that interfere with the privacy and property rights of Plaintiffs" or "passing any ordinance similar to [the Emergency Ordinance] that unreasonably interferes with the privacy and property rights of Plaintiffs"  Such an injunction, of course, would not comply with Fed. R. Civ. P. 65 and, moreover, would hamstring Defendants' legitimate and substantial interest in protecting and preserving the health and safety of the citizens of the Borough.

[19]     As the District Court for the Middle District of Pennsylvania observed in May, "[t]he Pennsylvania Supreme Court has recently held that 'there is no question that the containment and suppression of COVID-19 and the sickness and death it causes is a substantial governmental interest." Benner v. Wolf, 461 F.Supp. 3d. 154, 166 (M.D.Pa. 2020) (quoting Friends of DeVito v. Wolf, 227 A.3d 872, 903 (Pa. 2020)).

[20]     Plaintiffs also argue that the Borough will not be irreparably harmed if the Motion is granted because "neither the Emergency Declaration nor the [Emergency] Ordinance even restrict the ability of Borough residents to gather in much larger groups on public or commercial property." That argument misses the mark because it ignores regulations which the Commonwealth of Pennsylvania imposes upon commercial establishments, as aforesaid.  The Borough has no immediate need to duplicate those regulations to meet its legitimate and substantial interest, as aforesaid.

Philadelphia's challenged COVID-19 restrictions are] lifted. <u>Restaurant Owners Against</u> <u>Lockdown, LLC v. Kenney</u>, 2020 U.S. Dist. LEXIS 220853 (E.D. Pa. Nov. 20, 2020). This Court also held that

> [e]njoining the actions of elected officials in matters that affect public safety also constitutes an irreparable harm [and that] granting a temporary restraining order may result in more transmissions of COVID-19 and more cases of serious illness and death. Thus, the potential harm to the public to the public is significant and not outweighed by the irreparable harm Plaintiff[s] might suffer.

<u>Id.</u> (citing <u>Maryland v. King</u>, 567 U.S. 1301 (2012).

### D.    The Public Interest Favors Denial Of The Motion.

For the reasons set forth in the immediately preceding Section of this Memorandum of Law, the public interest favors denial of the Motion.

## IV.    <u>CONCLUSION</u>.

Plaintiffs have no likelihood of success on the merits of their claims and will not suffer irreparable harm if the Motion is denied.  Because Plaintiffs failed to establish the first two elements for injunctive relief, this Court must deny the Motion.  Even if Plaintiffs did establish those elements, though, this Court must then balance the equities. In that regard, and after considering the irreparable harm which could befall the Borough if this Court issues the injunctive relief which Plaintiffs seek, this Court should exercise its sound discretion and deny the Motion.[21]

---

[21]    Only if a movant establishes the first two "gateway factors" does this Court consider the other factors set forth above. "The [C]ourt then determines 'in its sound discretion if all four factors, taken together, balance in favor of granting the requested relief.'" <u>421 E. Palisade Ave. Real Estate, LLC v. City of Englewood</u>, 977 F.3d 277, 283 n. 21 (3d Cir. 2020).

Date: December 9, 2020                    Respectfully submitted,

                                          **BUCKLEY, BRION,**
                                          **McGUIRE & MORRIS LLP**

                                          By:    /s/ Kristin S. Camp
                                                 _____
                                                 Kristin S. Camp, Esquire

                                          By:    /s/ Michael S. Gill
                                                 _____
                                                 Michael S. Gill, Esquire

                                          Attorneys for Defendants
                                          Borough of West Chester & Mayor Diane Herrin

**IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DONALD URBANIC AND BETH ANN ROSICA | : | |
| | : | |
| *Plaintiffs* | : | No.: 2:20-CV-05588 |
| | : | |
| *v.* | : | Civil Action - Law |
| | : | |
| BOROUGH OF WEST CHESTER | : | |
| and MAYOR DIANE HERRIN | : | |
| | : | |
| *Defendants* | : | |

_____

## CERTIFICATE OF SERVICE

I hereby certify that, on December 9, 2020, a true and correct copy of Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Preliminary Injunction and Other Relief was served via United States First Class Mail, postage prepaid, addressed to counsel for Plaintiff as follows:

Lindsay A. Dunn, Esquire
MacElree Harvey, Ltd.
17 West Miner Street
P.O. Box 660
West Chester, PA 19381-0660

**BUCKLEY, BRION,
MCGUIRE & MORRIS LLP**

By:     /s/ Kristin S. Camp

_____

Kristin S. Camp, Esquire

By:     /s/ Michael S. Gill

_____

Michael S. Gill, Esquire